NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

TIMOTHY C., JUDY C., *Appellants*,

*v.*

NATALIE S., JAMES S., L.S., *Appellees*.

No. 1 CA-JV 22-0099
FILED 3-28-2023

Appeal from the Superior Court in Maricopa County
No. JS20875
The Honorable Lauren R. Guyton, Judge, *Pro Tempore*

**VACATED AND REMANDED**

COUNSEL

Jeffrey M. Zurbriggen, P.C., Phoenix
By Jeffrey M. Zurbriggen
*Counsel for Appellants*

Denise Lynn Carroll Attorney at Law, Scottsdale
By Denise Lynn Carroll
*Counsel for Appellee Natalie S.*

---

**MEMORANDUM DECISION**

Presiding Judge Maria Elena Cruz delivered the decision of the Court, in which Judge Angela K. Paton and Judge David D. Weinzweig joined.

---

**C R U Z**, Judge:

¶1        Timothy C. and Judy C. ("Guardians") appeal the superior court's denial of their petition to terminate Natalie S.'s ("Mother") and James S.'s ("Father"),[1] (collectively "Parents") parental rights. Because the superior court predicated its decision on incorrect legal principles under the abandonment and length-of-felony-sentence grounds, we vacate the order denying the termination of Mother's parental rights as to those two grounds and remand for proceedings consistent with this decision.

**FACTUAL AND PROCEDURAL HISTORY**

¶2        In 2016, L.S. was born substance-exposed to methamphetamine. Arizona Department of Child Safety ("DCS") initiated a dependency and eventually placed the child in a kinship placement with Guardians. Mother participated in services, and in March 2017, the court returned L.S. to Parents' custody. Over the next year, while L.S. lived with Parents, L.S. kept in close contact with Guardians. They visited with L.S. about four times a week, spent various weekends with her, and eventually kept her for weeks at a time.

¶3        By May 2018, Mother had relapsed on methamphetamine, and Parents were engaging in domestic violence; Father therefore placed L.S. with Guardians with Mother's consent. Since that time, Mother has had no contact with L.S. and has provided no support for her. L.S. believes Judy C. is her mother and does not know about or recognize Mother, even after Guardians showed the child Mother's photograph. In February 2019, the superior court appointed Guardians as L.S.'s permanent guardians with Parents' consent.

---

[1]        Father consented to the relinquishment of his parental rights and has not filed a brief in this appeal.

**¶4**            In April 2019, Mother was arrested and the following month, was sentenced to five years' imprisonment for possessing methamphetamine for sale. Concurrently with that sentence, Mother served time for forgery and drug paraphernalia convictions. Shortly after her arrest, Mother placed Timothy C. and L.S. on her visitation list and sought contact with Guardians through her family members.[2] L.S.'s maternal grandmother agreed to relay Mother's address to Guardians.

**¶5**            In January 2020, the prison issued Mother a tablet with email capability, and soon afterwards, disallowed in-person visits due to Covid. Around April, Mother received her first letter from Guardians (and with it their address) and over the next few years, she sent them a few letters or postcards. That July, Mother began a prison program that allowed her to work full time and live on her employer's premises.

**¶6**            Meanwhile, Guardians submitted paperwork that allowed them to exchange emails with Mother via the prison tablet. After the prison approved Guardians' paperwork in September 2020, they regularly exchanged emails with Mother about L.S., often attaching pictures of the child.

**¶7**            Sometime between December 2020 and early 2021, the prison approved Guardians and L.S. to have telephone calls and video visits with Mother. The parties dispute whether Mother ever affirmatively asked to speak to L.S. The exhibits show that Mother often expressed her desire for and excitement about eventually getting to know L.S., but Guardians, not Mother, initiated the few discussions they had about phone or video contact. Even during these discussions, Mother never affirmatively asked to speak to L.S. The parties agreed, however, that not all their communications were in evidence.

**¶8**            In May 2021, Guardians petitioned to terminate Father's parental rights based on the relinquishment of his rights, *see* Arizona Revised Statutes ("A.R.S.") section 8-533(B)(7), and Mother's parental rights based on abandonment, neglect, and length of felony sentence, *see* A.R.S. § 8-533(B)(1)-(2), (B)(4). That same month, Father signed an agreement relinquishing his parental rights upon L.S.'s adoption and consenting to

---

[2]        The parties disputed whether Mother already had Guardians' contact information at this time. Regardless, both L.S.'s maternal grandmother and Timothy C. testified that several members of Mother's family had Guardians' contact information.

Guardians' adoption of L.S. About three months later, Mother emailed Guardians asking for in-person visits with L.S. After a trial, the superior court denied Guardians' termination petition. Guardians appealed. We have jurisdiction pursuant to A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

**¶9** A parent's right to custody and control of her own child, while fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248-49, ¶¶ 11-12 (2000). Termination of a parental relationship may be warranted when the State proves one statutory ground under A.R.S. § 8-533 by "clear and convincing evidence." *Id.* at 249, ¶ 12. "Clear and convincing" means the grounds for termination are "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284-85, ¶ 25 (2005). The court must also find that termination is in the child's best interests by a preponderance of the evidence. *Id.* at 288, ¶ 41.

**¶10** This court "will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). This court does not reweigh the evidence, but "look[s] only to determine if there is evidence to sustain the court's ruling." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). "An abuse of discretion is discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *Englert v. Carondelet Health Network*, 199 Ariz. 21, 27, ¶ 14 (App. 2000) (citation and internal quotation marks omitted). "A trial court abuses its discretion when it misapplies the law or predicates its decision on incorrect legal principles." *State v. Jackson*, 208 Ariz. 56, 59, ¶ 12 (App. 2004).

### I. Neglect

**¶11** Guardians argue the superior court abused its discretion by denying their termination petition under the neglect ground. When a parent neglects her child, the superior court may terminate her parental rights. A.R.S. § 8-533(B)(2). Neglect means "[t]he inability or unwillingness of a parent . . . to provide [her] child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes substantial risk of harm to the child's health or welfare." A.R.S. § 8-201(25).

**¶12** The superior court found that Guardians failed to prove this ground because Mother granted them a voluntary guardianship to ensure the child's needs would be met. Specifically, the court found that Mother

"made the conscious decision to leave the child in the care of family members who could parent in her stead." Guardians challenge this finding, asserting that Father arranged the guardianship, not Mother. Who originally arranged the guardianship is irrelevant, however, because Mother consciously gave her consent by signing the guardianship application.

¶13        Regardless, Guardians failed to argue or present evidence that, considering the guardianship, Mother's inability, or unwillingness to meet L.S.'s needs caused a substantial risk of harm to L.S.'s health or welfare.

II.    Abandonment

¶14        Guardians next argue the superior court abused its discretion by misapplying the facts to the law because the substantial weight of the evidence supports a finding that Mother abandoned L.S. A parent may forfeit her parental rights if she abandons her child. A.R.S. § 8-533(B)(1). Abandonment occurs when the parent fails to "provide reasonable support and to maintain regular contact with the child, including providing normal supervision." A.R.S. § 8-531(1). Abandonment is measured by a parent's conduct, not her subjective intent. *Michael J.*, 196 Ariz. at 249-50, ¶ 18. The court must consider whether the parent "has provided reasonable support, maintained regular contact, made more than minimal efforts to support and communicate with the child, and maintained a normal parent-child relationship." *Id.* "Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment." A.R.S. § 8-531(1). A parent must make more than minimal efforts to support and communicate with the child. *Id.*

¶15        As an initial matter, the evidence is undisputed that for about a year before Mother was incarcerated, she had no contact with L.S. and paid no support. From May 2018 through 2019 Mother was homeless and abusing drugs, and made no effort to contact Guardians or L.S. Regarding this year, the superior court found that because of Mother's homelessness, she "could not have a meaningful relationship with her child" but had "consented to the guardianship of her child prior to going into custody." But L.S. was not under a guardianship for most of the year; Mother only consented to it a few months before her current incarceration. Guardians contend the court improperly excused Mother's inaction due to her homelessness and the consensual guardianship, arguing a voluntary guardianship cannot act as a defense to abandonment.

**¶16** Although homelessness and a voluntary guardianship are relevant factors to consider, the focus of the court's analysis should be on the parent and her efforts to assume the myriad responsibilities of parenting. *See* A.R.S. § 8-531(1) (Abandonment "means the failure *of a parent* to provide reasonable support and to maintain regular contact with the child, including providing normal supervision.") (emphasis added). It is a fact-intensive inquiry. *See Michael J.*, 196 Ariz. at 250, ¶ 20 ("What constitutes reasonable support, regular contact, and normal supervision varies from case to case.") (citation and internal quotation marks omitted). Nonetheless, the parent's efforts to support, communicate, and maintain a relationship with the child must be more than minimal. *Id.* at ¶ 21. And "when circumstances prevent the . . . [parent] from exercising traditional methods of bonding with [her] child, [she] must act persistently to establish the relationship however possible and must vigorously assert [her] legal rights to the extent necessary." *Id.* at ¶ 22.

**¶17** In sum, although a voluntary guardianship is one factor to consider, it also does not automatically prevent a court from concluding a parent has abandoned a child. *See* A.R.S. § 8-533(A)-(B)(1) (no express limitation preventing legal guardians from filing a termination petition).

**¶18** Guardians also assert that the substantial weight of the evidence supports a finding that Mother abandoned L.S. after she was incarcerated because she provided the child "no money, no clothes, no health care, no shelter, no care, no more than one or two cards, no gifts, no letters, and no parental input or guidance," and had not seen or spoken to L.S. since May 2018.

**¶19** We need not address this argument, however, because the court impliedly found that Mother had abandoned L.S. over four years by "fail[ing] to maintain a normal parental relationship" with her. *See Trimble Cattle Co. v. Henry & Horne*, 122 Ariz. 44, 46 (App. 1979) (This court must "assume that the trial court made all findings necessary to support the judgment."). Still, the court denied the termination petition because it also found that Mother had just cause for failing to maintain a relationship with her child. *See Calvin B. v. Brittany B.*, 232 Ariz. 292, 293, ¶ 1 (App. 2013) (A guardian "who has persistently and substantially restricted [a] . . . parent's interaction with their child may not prove abandonment based on evidence that the other has had only limited involvement with the child.").

**¶20** Guardians assert that no reasonable evidence supports this finding and the court improperly placed Mother's duty to maintain the

parental relationship on them.  They further contend that all the law requires is "that they not interfere with Mother's access" to the child.

**¶21**      The superior court applied incorrect legal principles. Although the court found Mother "had just cause," for failing to maintain a relationship with L.S., it did not reference the *Calvin B.* standard in the order or expressly analyze whether Guardians acted persistently and substantially to restrict Mother's access to the child.

**¶22**      Instead, the superior court found that Guardians did "nothing . . . to attempt to foster a relationship between the child and Mother," and at times, "delayed any contact with Mother, citing unfamiliarity with the system at the prison."  The superior court also faulted Guardians for not asking maternal grandmother, with whom they had contact, about facilitating prison communication between Mother and L.S.  But inaction and delay alone do not necessarily amount to "persistent and substantial" restriction, and the court's order did not analyze the issue further.  *Cf. Calvin B.*, 232 Ariz. at 297, ¶¶ 21-24 (child's mother refused to allow father parenting time in violation of court order).

**¶23**      Also concerning is the court's reliance on a phone call between Mother and Timothy C.  The court found that during the call, Mother "expresse[d] her desire to . . . rebuild [her] relationship" with L.S., and Timothy C. warned that Father may want to get full custody, so he wanted to "protect [her] interests, too."  The court's finding implies that Timothy C. sought to discourage Mother's attempts to have contact with L.S. by raising the issue of Father's potential reaction.

**¶24**      The court's finding is inconsistent with the record.  During the phone call, Mother did not ask for video visits.  Timothy C. spontaneously raised the topic.  Mother replied she was "off on Saturdays . . . if we could ever get [L.S.] to wanna see me."  Timothy C. replied that L.S. "just hasn't seen you for a long, long time and probably has the same nervousness" Mother had.  Mother acknowledged, "It's gonna be a process I'm gonna have to take at [L.S.'s] pace when I get out[,] . . . but that is still a few years away."

**¶25**      The conversation then turned to Mother's employment plans upon her release, and eventually, to Father, his new marriage, and his recent visit with L.S.  Timothy C. then explained, "when [Father and his new wife are] here, they seem to have . . . a special interest in [L.S.].  But when they leave and go away, it's not very often they [call] to check up on her or anything like that.  But I thought they were gonna make a run at

getting custody of her. With him being married and all that now, and [having] somebody . . . who can take care of [L.S.], I wanted to protect your interests too." He shared his worry that Father may "take advantage of [Mother's] situation" and that it would "be so easy . . . for him to try to take custody of [L.S.]." Mother agreed, and the phone call ended. Thus, the conversation about Father's interest in L.S. did not directly follow Mother's expressed desire to "get [L.S.] to wanna see me," and it was unclear what Timothy C. was referring to.

¶26 Because the superior court's order does not express or apply the correct legal principle for a finding of "just cause," and on this record, no reasonable evidence supports such a finding, we vacate the order finding the abandonment ground was not proven.

III. Length of Felony Sentence

¶27 Guardians argue the superior court erred under the length-of-sentence ground by finding that they were required to make "reasonable and diligent efforts to provide reunification services and maintain the familial bond while [Mother] was incarcerated." They contend this requirement is not expressly required by A.R.S. § 8-533(B)(4), and any constitutional duty to provide services is applicable only when the State seeks termination.

¶28 In its order, the superior court applied *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 582, ¶ 21 (2021), which holds that when DCS seeks to terminate parental rights under the length-of-sentence ground, it has a constitutional duty to make reasonable efforts to "initiate measures designed to address an incarcerated parent's desire to maintain a parent-child relationship." The duty is triggered when the incarcerated parent requests services, such as visitation, and applies only if providing the services or visitation does not endanger the child. *Id.* However, *Jessie D.*'s holding specifically applies to situations in which the State is a petitioner; it does not apply to a private petitioner.

¶29 Mother argues the superior court cited *Jessie D.* only to highlight Guardians' "failure to provide contact with the child" and to liken its "requirement to the placement [in State-initiated cases] who can't deny any contact with the parent and then claim that the factors for *Michael J.* apply." *See Michael J.*, 196 Ariz. at 251-52, ¶ 29. But Mother cites no authority to support her proposition that Guardians had any duty to provide contact between L.S. and Mother. Moreover, the superior court did

not expressly find that Guardians denied contact between Mother and L.S. At most, it found that they delayed contact.

**¶30**     We therefore reject Mother's attempt to parse the court's order.   The court specifically found that Guardians "have not made reasonable and diligent efforts to provide reunification services and maintain the familial bond while the parent was incarcerated."  It therefore erred in finding Guardians had a duty to "maintain the familial bond while [Mother] was incarcerated."  The court's misapplication of *Jessie D.* to this case directly affected its analysis of the *Michael J.* factors.  *See* 196 Ariz. at 251-52, ¶ 29.   For these reasons, we vacate the court's order denying termination under the length-of-sentence ground.

## CONCLUSION

**¶31**     We vacate the superior court's order denying termination under the abandonment and length-of-sentence grounds and remand for proceedings consistent with this decision.



AMY M. WOOD • Clerk of the Court
FILED:     AA